UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff(s), ) | |
| ) | |
| vs. ) | Case No. 1:05CR 105 ERW |
| ) | |
| QUITMAN CARTER, ) | |
| ) | |
| Defendant(s). ) | |

## **REPORT AND RECOMMENDATION**

The defendant, Quitman Carter, is charged by Indictment with Being a Felon in Possession of a Firearm. He filed one pretrial motion: Defendant's Motion to Suppress Evidence and Statements and Memorandum in Support (Document #25). The government filed Government's Response to Defendant's Motion to Suppress Evidence and Statements (Document #28). An evidentiary hearing was held on the defendant's motion to suppress.

## **Factual Background**

On June 19, 2005, Caruthersville Police Officer James Morgan was contacted shortly before midnight by a person who desired to report some criminal activity. The person told Morgan that they were at the Jiffy Jims convenience store in Caruthersville when a black male in his late 40's pulled a handgun and displayed it to them. The men

- 1 -

were having a verbal argument before the handgun was seen.  The man with the handgun was driving a red Ford Explorer.

Morgan related to other officers what he had been told.  Various members of the police force began looking for a person fitting that general description.  One of those officers was Tina Cook.  Officer Glen Traughber was also driving in the city, looking for the man with the gun.

As Traughber was driving around the city, he passed the Economy Inn.  He called Cook and reported that he thought he saw a red Ford Explorer in the parking lot of that motel.  Cook was approaching the motel at that time and pulled into the parking lot.  Shortly thereafter, Traughber entered the same lot.  They decided to try to find the driver of the red Ford Explorer.

The Economy Inn has its rooms on the ground floor that face the parking lot.  The Explorer was parked in front of Room Number 10.  Cook felt the hood of the Explorer.  It was still warm.  She believed that the vehicle has just been parked.  The officers' cars were parked just outside the Number 10 room area.

Cook then knocked on the door to Room Number 10.  A black male looked out the window of the room at the officers.  Cook continued to knock on the door and called out that she was a police officer.  The man inside responded "Hang on; I'm getting dressed."  Officer Cook continued to knock on the door at intervals.  The man took about a minute and a half to get to the door.  Shortly before opening the door,

Cook heard a sound that sounded like a porcelain toilet tank lid being placed back on the water storage tank. Soon after Cook heard that sound, the man opened the door. The man, later identified as the defendant, Quitman Carter, stepped back into the room and said, "You all, come on in." He was holding both hands up in a surrender position while he was backing up. Cook and Traughber entered the room. Carter sat down on a corner of the bed.

Carter was wearing only a pair of pants that were not zipped up or buttoned. Cook asked Carter why it took him so long to open the door. Carter replied that he was getting dressed and that he had been sleeping. Carter appeared to be nervous. He did not look directly at the officers, but appeared to be looking around the room. Cook had information that the person they were looking for had a firearm, so she became apprehensive that Carter was looking for a gun. She then told Carter what had been reported earlier in the evening about the man brandishing a handgun at the convenience store. She told him that he fit the general description of the man seen at that store. Cook then obtained Carter's identifying information.

Carter told Cook that he did not have a handgun and that he had not been to Jiffy Jims. Carter said that his friend "Jerry" had borrowed his truck earlier. Cook asked where Jerry was. Carter replied that he had left. Carter then observed that there was a beer on a table that was cold to her touch and that there were also some pizza sticks that were still hot. She asked Carter whose food was on the table. Carter said that the

food and beer was not his.  Cook observed that the beer bottle was open and full.  Cook also noticed that some female clothing and shoes were in the room on the floor.  Cook asked Carter if anyone else was in the room.  He said no, but that a female had been there earlier.  Carter told Cook that Jerry and the female had left and must have left their food.  Cook then asked if the man left his food, was it also possible that gun was left behind.  She then asked if Carter would mind if the officers looked around the motel room.  Carter replied, "No, go ahead and look anywhere you want, here are the keys to my truck, you can look in there, too."

Traughber then stated that he had heard a porcelain lid sound shortly before the door was opened.  Cook walked into the bathroom of the motel room.  As soon as she did, Carter said, "Oh, shit."  Cook stepped back out of the bathroom and looked at Carter.  He was sitting on the bed, looking at the ground and shaking his head.  Cook re-entered the bathroom and lifted the porcelain lid off the toilet water tank.  She observed that a black pistol was inside the water tank, submerged under the water.

Cook told Traughber that she had located a weapon.  Traughber placed Carter under arrest.  At this time, Cook began hearing scratching noises coming from underneath the bed.  The mattress and box springs were resting on a solid frame that prevented the officers from looking under the bed.  They lifted the mattress and box springs off the bed.  Underneath was a naked juvenile female.  The female would not

tell the officers who she was or where she was from. She was released to the juvenile authorities.

Cook examined the pistol. She discovered that the clip to the pistol was loaded with five rounds of ammunition. Another round was jammed in the barrel of the gun.

Carter was taken to the Caruthersville Police Station where he was processed on a municipal violation and released.

Later, Officer Cook decided to re-interview Carter if he would consent. She contacted him and asked him to meet her at the Kennett Police Department. He agreed.

On June 27, 2005, at around 7:32 p.m., Cook met with Carter. She read him his <u>Miranda</u> rights and asked him if he understood his rights. He said he did and that he would speak with her. Cook asked him to sign a <u>Miranda</u> Warning Waiver if he was willing to talk. He said that he would. Cook filled out the form, including Carter's answers to her questions from the form. Carter initialed his answers and signed the waiver form. Cook then began to ask questions of Carter.

During that interview, Carter admitted that he was in possession of the pistol in the motel room. He stated that he bought the pistol from Tim Weatherspoon in Hayti. Carter paid $200 for the gun. He told Cook that when the officers came to his motel room, that he put the pistol in the toilet tank. Carter also admitted displaying the firearm to the men at the Jiffy Jims store and claimed that they were going to rob him.

He said that the police showed up at his room about ten minutes after the altercation at Jiffy Jims.

## Discussion

In Defendant's Motion to Suppress Evidence and Statements (Document #25), the defendant alleges that the motel room where the defendant was found and arrested on June 19, 2005, was searched "in the absence of the consent of any person with the actual or apparent authority to consent to such a search."

At the close of the evidence at the evidentiary hearing, the parties discussed the necessity or usefulness of submitting memoranda to the court. Both the counsel for the defendant and counsel for the government determined that the sole question which needs to be determined by the court is whether or not consent was given by the defendant to search the motel room. The court finds the search was consensual.

Flowing from the defendant's position that he did not give consent to the search of his motel room is his contention that because the search was illegal, statements made in connection with or following the search, both oral and written, were fruit of the poisonous tree. Wong Sun v. United States, 371 U.S. 471, 484-488, 83 S.Ct. 407 (1963).

As mentioned earlier, the only issue to be decided by the court, as determined by the defendant and the government, is whether consent to search the defendant's motel room actually was given. There is no contention that the consent, if given, was

involuntary or that the defendant's will was overborne. There was no contention that the defendant was incompetent to give consent. If there were a contention that the consent was involuntary or that the defendant was incompetent to give consent, the court would be required to do an analysis as directed in United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990), or other case law. However, that type of analysis is not necessary. As the parties agreed, it is a factual issue to be determined by the court as to whether consent was actually given.

The testimony of Officer Cook and the defendant's own written statement relate that the defendant agreed to the search of the motel room. Officer Cook testified, "I said, 'Mr. Carter, would you mind if I took a look around,' and he said, 'Yes, go right ahead.' He pointed to the nightstand by the door and said, 'There are keys to my truck– you can look in there also.'" In his written statement given on June 27, 2005, Mr. Carter related, "Officer Cook asked me if she could search the motel and I said yes and she could search my car too."

At the evidentiary hearing, in direct examination by his attorney, the defendant testified as follows:

> Q   Did they ever ask you for consent to search the room?
>
> A   No, sir, they didn't.
>
> Q   Did you ever give them consent to search the room?
>
> A   No, I didn't.

> Q What, if anything, did they ask for consent to search?
>
> A They asked me who was driving my truck - I told them I lended my truck to a friend of mine - says who's your friend - I said Jerry - she say well you don't know whether Jerry left a gun here or not - I said I don't know - I say there's my keys laying on the dresser - you can search my truck.

With regard to his written statement, Mr. Carter stated at the evidentiary hearing that he did not have his glasses on; he did not read the text of the statement which was written by Officer Cook. He testified he had read the statement later when he had his glasses and the last page of the statement and especially the last paragraph contained some things that he did not speak to Officer Cook about. He testified he did not tell Officer Cook she could search the motel room. He told her she could search his car.

The testimony of Officer Cook and defendant's written statement are directly contradictory to defendant's testimony at the evidentiary hearing. It is the court's task to determine who is telling the truth.

Both Officer Cook and Defendant Quitman Carter would have an interest in being believed. A valid consent to search would justify the search by Officers Cook and Traughber which led to the discovery of the pistol and charges against Mr. Carter. Police officers do have an interest in correctly performing their duties and in not

omitting an essential step in a legal search which could jeopardize an arrest and possibly a later conviction.

Mr. Carter has a much stronger motivation to have his version of the incident believed – not to be convicted and the retention of his freedom. If the search was illegal and the seizure of the pistol violated his constitutional rights, the pistol would be suppressed and could not be used to support the charge of defendant's being a felon in possession of a firearm. On the other hand, if the defendant is convicted, he is facing a possible term of imprisonment of fifteen years.

At the evidentiary hearing, the defendant admitted on cross-examination that he had several felony convictions: Assault with Intent to Kill; Burglary and Stealing; Involuntary Manslaughter; and Unlawful Use of a Weapon.

Mr. Carter admitted on cross-examination that he had lied to the questioning officers five times after he was arrested. A review of the factual background related at the beginning of this Report and Recommendation indicates that almost everything the defendant told the officers at the motel was false.

There is indication that the defendant also lied on the stand at the evidentiary hearing. He testified that he placed the pistol in the commode when he first went to the motel room. He was later asked on cross-examination if he had been to the Jiffy Jims convenience store on the evening that he was arrested. He replied that he went to Jiffy Jims twice. He was asked if he had the pistol with him when he went to Jiffy Jims. He

answered not the first time, not the second time. He was asked on cross-examination if he displayed the pistol the first time he went to Jiffy Jims. He replied no he did not. He did not take the pistol out and show it to the others he was having a quarrel with.

The Assistant United States Attorney then told Mr. Carter that he had the surveillance tape from the store and asked Mr. Carter if he wanted to rethink his answer. Mr. Carter repeated that he did not flash the gun, even on the occasion of his second trip to Jiffy Jims.

On redirect, the defendant's attorney reminded the defendant that he had not seen the video tape the Assistant United States Attorney was talking about. He was asked by his attorney if it was possible that he did, in fact, display a weapon to the gentlemen he had an altercation with that night and he simply did not remember it. The defendant said he did have a gun in his possession the second time he went back to the convenience store. He admitted to his attorney that if the surveillance tape shows he had a gun in his possession, he would not be in a position to dispute that.

It is clear to the court that the defendant changed his story on the stand concerning his possession of the pistol and possibly displaying it at the convenience store after he was reminded that there was a surveillance tape which was in the possession of the Assistant United States Attorney.

Determining whether the defendant gave consent to the search of his motel room depends on the credibility of the two witnesses who testified at the evidentiary hearing. From the admission by the defendant that he lied five times to the police officers in the motel room and from the change in his testimony on the witness stand when he was reminded of a surveillance tape, the court finds that the defendant is not credible. The court finds that Officer Cook is credible. The court further finds that the defendant gave consent to the officers to search his motel room. The search was a consensual, legal search and all evidence found as a result of the search is admissible in evidence.

The defendant's motion to suppress sought the suppression of both physical evidence and statements he made. With respect to his statements, it has been the defendant's contention that his statements, both oral and written, were "fruit of the poisonous tree" because they were obtained following the search of the motel room which the defendant claimed was without consent and, therefore, was illegal.

The court has found that the defendant gave consent to the officers for the search of the motel room and as a result, his statements were not fruit of the poisonous tree and are admissible in evidence.

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Document #25) should be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(l), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of October, 2005.